**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| SEYMOUR FEIN | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NO. 15-cv-03709-PX |
| | * | |
| CHIRHOCLIN, INC. | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

<u>INDEX OF EXHIBITS TO PLAINTIFF</u>
<u>SEYMOUR FEIN'S MOTION FOR SUMMARY JUDGMENT</u>

***UNSEALED EXHIBITS***

Exhibit A. May 4, 2005 agreement between Dr. Seymour Fein and ChiRhoClin,  Inc. (the "May 2005 Agreement).

Exhibit B. May 4, 2015 email from Dr. Fein to Dr. Purich and Jean Purich regarding restarting royalty payments.

Exhibit C. August 31, 2015 draft letter from Skip Purich to Dr. Fein regarding adjustments to the May 2005 Agreement.

Exhibit D. November 10, 2015 letter from Dr. Purich to Dr. Fein regarding the May 2005 Agreement.

Exhibit E. June 30, 2016 letter from Dr. Purich to Dr. Fein purporting to terminate the May 2005 Agreement.

Exhibit F. April 4, 2011 email from Dr. Fein to Jean Purich requesting confirmation of royalty obligations for mortgage broker.

***SEALED EXHIBITS (FILED SEPERATELY UNDER SEAL)***

Sealed Ex. 1.  April 11, 2011 letter from ChiRhoClin confirming payment obligations to Dr. Fein.

Sealed Ex. 2. Repligen settlement agreement with ChiRhoClin.

Sealed Ex. 3. ChiRhoClin letters regarding payments to Repligen in 2008.

Sealed Ex. 4. ChiRhoClin Organization chart.

Sealed Ex. 5. October 15, 2015 email from Jean Purich to Skip Purich with spreadsheet showing all royalty calculations.

Sealed Ex. 6. May 5, 2011 email from Dr. Fein to Dr. Massimo.

Sealed Ex. 7. December 4, 2009 email from Dr. Fein regarding clinical trial protocol.

Sealed Ex. 8. October 4, 2010 email from Dr. Fein regarding medical monitoring.

Sealed Ex. 9. June 4, 2015 email from Dr. Fein regarding review of adverse events in clinical trial.

Sealed Ex. 10. November 19, 2012 email from Dr. Fein regarding adverse event.

Sealed Ex. 11. December 16, 2014 email from Dr. Fein regarding package insert revisions.

Sealed Ex. 12. June 22, 2011 email from Dr. Fein regarding draft letter to doctors.

Sealed Ex. 13. June 26, 2009 email from Dr. Fein regarding secretin initiatives in the EU.

Sealed Ex. 14. April 1, 2010 email from Edward Purich to Dr. Fein attaching ChiRhoStim shipments and payment information.

Sealed Ex. 15. January 28, 2009 email from Jean Purich to Dr. Fein attaching spreadsheet showing first royalty payment calculation.

Sealed Ex. 16. April 15, 2010 email from Dr. Fein to Jean Purich.

Sealed Ex. 17. April 14, 2009 email from Dr. Fein to Dr. Purich regarding payment calculations.

Sealed Ex. 18. January 1, 2011 email from Dr. Fein to Jean Purich.

Sealed Ex. 19. July 11, 2012 email from Dr. Purich to Dr. Fein.

Sealed Ex. 20. January 22, 2013 email from Dr. Fein to Dr. Purich.

Sealed Ex. 21. March 18, 2010 email from Dr. Purich to Jean Purich with shipment and payment spreadsheet.

Sealed Ex. 22. December 17, 2010 email from Dr. Purich to Dr. Fein with shipment and payment spreadsheet.

Sealed Ex. 23. April 2, 2011 email from Dr. Purich to Dr. Fein with shipment and payment spreadsheet.

Sealed Ex. 24. Letter from Dr. Purich to FDA stating porcine secretin NDA should remain active.

Sealed Ex. 25. July 9, 2014 draft letter from Skip Fein regarding potential porcine secretin sales in the Netherlands.

Sealed Ex. 26. January 16, 2013 email from Jean Purich to Dr. Fein attaching spreadsheet showing final royalty payment.

Sealed Ex. 101. Jean Purich July 1, 2016 deposition transcript.

Sealed Ex. 102. Edward Purich July 1, 2016 deposition transcript.

Sealed Ex. 103. Skip Purich July 12, 2016 deposition transcript.

# Exhibit A

**SEYMOUR H. FEIN, M.D.**
**476 CANOE HILL ROAD**
**NEW CANAAN, CONNECTICUT 06840**

May 4, 2005

Edward Purich, Ph.D.
Chief Executive Officer
ChiRhoClin, Inc.
4000 Blackburn Lane – Suite 270
Burtonsville, Maryland 20866

Dear Ed:

This letter represents the agreement between Seymour Fein and ChiRhoClin (Company), to change the relationship between the parties.
For its part, Seymour Fein will:

1. Sell his portion of ownership in ChiRhoClin back to the Company for $1.00.
2. Loan the Company $375,000 at 1% simple, annual interest.
3. Not require payment of any principle or interest on said loan until July 1, 2009.
4. Forgive the loan in its entirety, including interest, if the Company does not regain the right to sell psecretin.
5. If requested, provide consulting services to the Company related to medical monitoring, medical affairs, drug safety surveillance, and clinical research. Said services to be provided without monetary compensation.

For its part, ChiRhoClin:

1. Acknowledges that Seymour Fein has no financial obligations or liabilities to the Company, either existing or future, other than as stated above in this agreement.
2. Ackowledges that Seymour Fein has no ongoing managerial, executive or decision making role in the Company.
3. Acknowledges that Seymour Fein has no liability for actions and practices of the Company prior to this agreement or in the future.
4. Will pay to Seymour Fein a 15% royalty on gross revenues from the sale of hsecretin and psecretin. The obligation to pay this royalty will begin when the Company regains the right to sell psecretin. Said royalty to include sales of hsecretin and psecretin licensed to other organizations by the Company including sales in and outside of the United States.
5. Repay the $375,000 loan in full and with interest, by July 1, 2011. This loan repayment is in addition to the 15% royalty.

EXHIBIT
PENGAD 800-631-6089
2
7-1-16

CRC0000301

This agreement will be governed by the laws of the state of Maryland. The signatures of Dr. Edward Purich and Dr. Seymour Fein on this agreement constitute acceptance between the parties of all its terms and conditions.


Edward Purich, Ph.D.
Chief Executive Officer
ChiRhoClin, Inc.

Seymour Fein, M.D.

CRC0000302

# Exhibit B

**From:**      Seymour Fein <seymour.fein@markusresearch.com>
**Sent:**      Monday, May 04, 2015 7:51 PM
**To:**        epurich@chirhoclin.com
**Cc:**        'Jean Purich'
**Subject:**   Royalties

Dear Ed,

You're copied on the recent exchange of emails between Skip and me. I want you to know that I appreciate how difficult the FDA and some unfortunate circumstances has made things for you over the last few years. That's why for almost 2.5 years I've not asked for any royalties from the limited sales of ChiRhoStim which FDA has allowed you to make. You need to keep things going at CRC as best you can and survive to come out the far end of this regulatory tunnel intact.
I know you're aware of this and, in turn, appreciate my efforts to help out in the limited ways I can.
But I have some financial pressures as well and need to ask you if there is any way to make some modest payments to me from ongoing sales, perhaps on a monthly basis. Not talking about lump sum or back payments which I know there are no resources for.
I'd be grateful if you and Jeanne could look into this and give it some consideration. When you have a chance to do this let's discuss as partners and friends.

Best regards,
Seymour



CRC0001327

# Exhibit C

| | |
|---|---|
| **From:** | Skip Purich <spurich@chirhoclin.com> |
| **Sent:** | Monday, August 31, 2015 5:57 PM |
| **To:** | 'jpurich@chirhoclin.com'; epurich@chirhoclin.com |
| **Subject:** | Dear Seymour.docx |
| **Attachments:** | Dear Seymour.docx |

Please review the First draft.

Thanks,

Skip

1



CRC0001216

Dear Seymour,

I am writing to you to discuss our future plans with ChiRhoStim® (Human Secretin for injection). We are in the process of expanding ChiRhoStim worldwide. I have identified and started preliminary negotiations with several companies to distribute license and market our product overseas. The areas we are starting to expand are the following the European Union (EU) and Asian markets (Japan, Korea, Australia, New Zealand, South Africa, and Singapore.

However we are experiencing certain types of constraints of expansion due the fact of former contractual agreements. I like to open up a dialogue with you to discuss changing the initial agreement that was signed May 4, 2005. In order for us to expand we are unable to proceed if we have a 15% off of gross revenues for human and porcine secretin.

If we are to proceed into these countries. The profit margins will be different than the US market. The price in the United States market is obviously different than the European Union, as well different in Japan. We need to have the ability to be a little more flexible so we may expand into these areas.

We would like to propose some changes to the existing agreement.

1. Change the term gross revenues to adjusted gross revenues after cost of goods (COG)
2. Change the percentage to 10%
3. Formalize a contract between ChiRhoClin and Seymour Fein for the services you will provide for CRC for the adjusted gross revenues percent.
4. Change the term Royalties to Services Rendered "IRS does not allow royalties term to be used.
5. To solidify Dr. Fein's role as medical director for ChiRhoClin.
6.

These 5 changes will allow ChiRhoClin to expand into foreign markets and grow the sales in these areas. You will gain significantly as we continue to expand in these marketing areas.

We are excited to be able to be in this position of growth but. I cannot proceed further until we have finalized terms with you. I have to make sure everybody will benefits and that it will be worthwhile expanding. In the current environment it is not. That is why we need to do some restructuring the agreements.

Thank you


Skip.

# Exhibit D

**From:** Skip Purich <spurich@chirhoclin.com>
**Sent:** Wednesday, November 11, 2015 2:37 PM
**To:** seymour.fein@markusresearch.com
**Cc:** epurich@chirhoclin.com; jpurich@chirhoclin.com; spurich@chirhoclin.com
**Subject:** CRC Letter
**Attachments:** Seymour111015L.pdf

Dear Seymour,

Please find attached the letter that was prepared by Ed.  Ed will call you later this afternoon to confirm the receipt of the letter.

Sincerely,

Skip

Skip Purich, M.B.A.
Chief Operations Officer
ChiRhoClin, Inc.
4000 Blackburn lane Suite 270
Burtonsville, MD 20866
W 301-476-8388
F 301-476-9529

1



CRC0001136



4000 Blackburn Lane Ste 270
Burtonsville, MD 20866
301-476-8388
301-476-9529 FAX

November 10, 2015

Dear Seymour:

On behalf of ChiRhoClin, Inc. ("CRC" or the "Company"), this is in reply to your phone call of 10/8/15 and your follow-up email of 10/12/15.  As Ed Purich (EDP) told you in his email of 10/21/15, we here at CRC are all interested in trying to work out the matters we have been discussing recently.  Also, as EDP mentioned in his 10/21/15 email, these matters are of high importance to us and are critical to the future of CRC.  We have been looking at the history of this situation and at our options much more closely.

<u>Some Brief History</u>

Your 10/8/15 phone discussion and your 10/12/15 email  with EDP make quite clear that your position is based on the language of the two page letter agreement dated May 4, 2005 between you and CRC (the "2005 Agreement"). You have stated several times, including in paragraph 1 of your 10/12/15 email, that the provisions of the 2005 Agreement regarding the royalty payment were correct as you wrote them.  You have maintained this basic stance despite the position of EDP that the words "a 15% royalty on gross revenues" were intended to be, and should have said, "a 15% royalty on profits. [profits=total revenue-total expenses]" This was what you and EDP had discussed and agreed to shortly before you drafted the 2005 Agreement, and of the two formulations, it is the only one that makes any financial sense.  Nonetheless, you said in paragraph 7 of your 10/12/15 email that after application of the 15% royalty language of the 2005 Agreement, there are regular sales of about $7.2 million on which you have not been paid your "royalty".  Adjusted for certain expenses, you say this becomes $6,566,667 of sales on which you are owed a 15% royalty, or roughly $985,000.   We appreciate that in your 10/8/15 email you then discuss certain compromises that you would be willing to make which would reduce the amount owed to you.  But all of this is based on your initial position that you are owed 15% of gross revenues, because that is what the 2005 Agreement says, even though EDP has explained on the 10/8/15 phone call with you that this language was a mistake and makes no financial sense for many reasons.

I will not go into all the reasons CRC and I disagree with your interpretation of the 2005 Agreement on the 15% royalty.  CRC and I reject your position on this and reserve all our rights with respect to that issue. I know you know the extremely difficult circumstances facing CRC and EDP in 2005 at the time that, with your approval, CRC reached a settlement agreement with Repligen over pending litigation.  I can remember your great concern that you may lose many of your personal assets if CRC went to arbitration.  You and our attorney Edward Allera convinced my family that it was too risky to go to arbitration and with their help, I was pushed into settlement even though I still remain unconvinced that it was a good decision.  You will recall that this settlement happened quickly and at virtually the same time that you wrote and sent to EDP the 2005 Agreement to sign before you would pay your

CRC0001137

$375,000 loan contribution that was needed to fund and finalize the settlement with Repligen.  You also were so concerned about your personal liability affiliated with CRC ownership, that you made acceptance of the return of all your shares in CRC as a further condition for providing your loan contribution.  It is quite ironic that without any shares in CRC, your 15% of gross revenue trumps my 100 % ownership of stock in CRC.  It appears that greater than 80% of the gross revenue is used to pay expenses for operating CRC annually leaving EDP and CRC with less than 5% of gross revenue.


Payments made to Seymour Fein

Your 10/12/15 email does not review the history of the numerous payments made to you by CRC since 2008.  The following amounts are set forth in the spreadsheet that CRC sent to you during the teleconference we had on October 8, 2015, which summarized various financial amounts and events for CRC for the years 2001-2015.  These included, among other things, CRC income and expense items, loans by you and EDP to CRC, amounts paid to you from 2008 through the present, and amounts that result from applying your version of the 15% royalty formulation from 2010 to the present. These 15% calculations show that your approach to the 15% question makes no financial sense.

As you know, from 2008 through 2013, payments were made to you totaling approximately $2,015,002 per the spreadsheet.  These payments were for the following:

> $100,000 loan repayment in 2008-09 for loans made by you in 2001-2003

> $375,000 loan repayment in 2009 for the loan made by you in May 2005 (this was the loan reflected on the 2005 Agreement)

> $1,540,002 for 15% royalty payments in 2009-2013.

You always accepted these payments without question.  However, as shown in the next section below, under the terms of the 2005 Agreement, $1,915,002 of these payments were made in error – CRC had no obligation to repay your 2005 loan or to make any 15% royalty payments, and you had no right to keep any of these funds.

The 2005 Agreement

In the first part of the 2005 Agreement, as you drafted it, it states that Seymour Fein will:

> "2. Loan the Company $375,000 at 1% simple, annual interest.
> 3. Not require payment of any principle or interest on said loan until July 1, 2009.
> 4. Forgive the loan in its entirety, including interest, if the Company does not        regain the right to sell psecretin."

In the second part of the 2005 Agreement, as you drafted it, it states that ChiRhoClin:

> "4. Will pay to Seymour Fein a 15% royalty on gross revenues from the sale of hsecretin and psecretin. The obligation to pay this royalty will begin when the Company regains the right to sell psecretin. Said royalty to include sales of hsecretin and psecretin licensed to other organizations by the Company including sales in and outside of the United States."

As you can see, the express language you drafted and inserted into the 2005 Agreement says that if the Company never regained the right to sell psecretin, <u>all</u> principal and interest on your 2005 loan was to be forgiven and there was no obligation to pay <u>any</u> royalty to you on sales of psecretin or hsecretin.

<u>In fact, the Company never did regain the right to sell psecretin and to this day does not have this right</u>. From and after the time its settlement obligations to Repligen were satisfied in 2010, the Company never had the governmental approvals required for labeling, manufacturing, distributing and selling psecretin. As a result, (i) the Company did not regain and does not have the right to sell psecretin, (ii) the loan has been forgiven under the terms of the 2005 Agreement, (iii) the Company never had an obligation to make any royalty payments to you (no matter how measured), (iv) $1,915,002 of payments were made to you by mistake during 2009-2013 and (v) the Company requests that you return these funds to the Company promptly.  The Company retains all of its rights with respect to these and other items of damages as a result of your accepting and retaining these funds when you had no right to them.

Settlement of these matters

Seymour, despite the situation described above and your holding $1,915,002 of the Company's money, we are interested in reaching a simple and prompt compromise so that the Company, the Purich family and you can all put these matters behind us and move forward with clarity.  We are doing this in a spirit of good faith.  We have an approach to resolve all of this which is quite reasonable and involves some large concessions on our part.  This is offered for discussion in the name of settlement and compromise, but is not a legally binding offer at this point.

For the following approach, we define "profits from sales of psecretin and hsecretin" to be the sales revenues received in cash by the Company for all sales of psecretin and hsecretin, less all expenses of the Company based on quickbook records of the Company kept in the ordinary course and calculated annually after the completion of a fiscal year of the Company.

The main components of this approach would be the following:

(i) you would keep $375,000 of the amounts mistakenly paid to you, relating to the loan of $375,000 that was mistakenly paid back to you,

(ii) you would keep $747,735.40 of the other $1,540,002 that was mistakenly paid to you – this amount represents 15% of the profits from sales of psecretin and hsecretin during 2009 (fourth quarter), 2010, 2011, 2012 and 2013,

(iii) you would promptly return to the Company $792,266.60, which is the portion of the $1,540,002 mistakenly paid to you less the $747,735.40 you would keep under (ii) above,

(iv) the parties would sign a new agreement that would provide for the payment to you annually, over the next 5 years, of 15% of the annual profits from sales of psecretin and hsecretin by the Company, beginning with profits for the year 2016.  This new agreement, and the obligation to make any payments to you, would terminate after the final annual payment is made to you for fiscal year 2020.  The obligation to make these payments will also terminate with the death of you or EDP prior to 2020.

(v) the parties would enter into a mutual cancellation and complete termination of the Royalty portion of the 2005 Agreement going forward, with an acknowledgement that the parties have no further obligations under the Agreement and with mutual releases by the parties of all obligations and claims under it, and

(vi) at the Company's option, you would continue as the Company's medical director for no additional consideration during the five year period through the end of fiscal 2020.

We may be willing to consider your keeping the $792,266.60 owed to the Company under (iii) and reducing the amount you owe the Company by any amounts owed to you under (iv) above.  The parties would also agree to execute other mutually acceptable documentation reasonably related to consummating the settlement and compromise, including for accounting, tax or similar purposes.

Seymour, in light of the history of the events that bring us to this point -- including the mistaken payment to you of $1,915,002 -- we believe this approach is eminently fair and reasonable. Let us know at your earliest convenience if this approach is acceptable to you, so we can consider that in determining our course of action.

Sincerely,

Edward D. Purich, Ph.D
Chief Executive Officer
ChiRhoClin, Inc.

# Exhibit E



**4000 Blackburn Lane Ste 270**
**Burtonsville, MD 20866**
**301-476-8388**
**301-476-9529 FAX**

June 23, 2016

Seymour H. Fein, M.D.
476 Canoe Hill Road
New Canaan, CT 06840

Dear Seymour:

On behalf of ChiRhoClin, Inc. ("ChiRhoClin"), I hereby immediately terminate the letter agreement entered into between you and ChiRhoClin on May 4, 2005 (the "May 2005 Agreement"). Effective immediately, ChiRhoClin ceases to have any further obligations to you under the May 2005 Agreement. ChiRhoClin's termination does not operate as a waiver of the claims and defenses that ChiRoClin has raised with respect to May 2005 Agreement in *Fein v. ChiRhoClin, Inc.*, C.A. No. 8:15-cv-03709-PX (United States District Court for the District of Maryland "Litigation"), including but not limited to the lack of enforceability of the May 2005 Agreement; a lack of satisfaction of the May 2005 Agreement's conditions precedent, and mutual and/or unilateral mistake in construction of the May 2005 Agreement.

Sincerely Yours,

Edward D. Purich
Chief Executive Officer
ChiRhoClin, Inc.

EXHIBIT
45
7-12-16

# Exhibit F

| | |
|---|---|
| **From:** | Jean Purich <jpurich@chirhoclin.com> |
| **Sent:** | Wednesday, April 06, 2011 3:10 AM |
| **To:** | Seymour Fein |
| **Cc:** | Edward Purich |
| **Subject:** | Re: Tonight |

I will take care of it by Friday.
Jeanne

Sent from my iPad

On Apr 5, 2011, at 12:03 PM, "Seymour Fein" <seymour.fein@markusresearch.com> wrote:

> Dear Jeanne,
>
> I am forwarding to you the email below from a mortgage broker because I will be a co-signer on a mortgage loan my daughter Jessica is applying for. As part of the qualification process it would be helpful if you could send a brief letter, signed by Ed as the CEO of CRC, stating that I receive a royalty of 15% of gross revenues from sales of ChiRhoStim (synthetic human secretin) in perpetuity, that I have been receiving such royalties since 4th quarter 2008 , that yearly royalties range from $600 to 640K and that sales of ChiRhoStim and my royalty from those sales are expected to continue indefinitely into the future.
>
> If you could format that letter on CRC letterhead as a Word document signed by Ed, scan it and attach it to an email sent to the mortgage broker, Bruce Salik at his email address below sometime this week I would be most grateful.
>
> Thanks.
>
>
>
> Seymour
>
>
> ------------------------------------------------------------
> **From:** Bruce Salik [mailto:Bruce.Salik@prospectmtg.com]
> **Sent:** Monday, April 04, 2011 6:20 AM
> **To:** seymour.fein@markusresearch.com
> **Subject:** Tonight
>
>
> Seymour,
>
> I hope you enjoyed your weekend!

1



**EXHIBIT**

26

7-1-16

Please let me know what time you plan on coming in. I would also like to get your information to run credit for you and your daughter before you come in. I would need full names, address, date of birth, and social security numbers.

Thank you!

Bruce Salik
Vice President - Branch Manager
845-423-3300 Direct
845-634-4480 Fax
NMLS#79065
198 S. Main Street
New City, NY 10956
Bruce.salik@prospectmtg.com<mailto:Bruce.salik@prospectmtg.com>
www.MyProspectMortgage.com/bsalik<http://www.MyProspectMortgage.com/bsalik>

-----------------------------------------------------------------------
Confidentiality Statement: This email may contain attorney-client privileged or confidential information. It is for the sole use of the intended recipient(s). If you have received this transmission in error, immediately notify us by telephone at 818-981-0606 and return the original message to us at Prospect Mortgage, 15301 Ventura Blvd.,Suite D300,Sherman Oaks, CA 91403 via the United States Postal Service.

No virus found in this message.
Checked by AVG - www.avg.com
Version: 10.0.1209 / Virus Database: 1500/3548 - Release Date: 04/03/11

CRC0002798