IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SEYMOUR FEIN, | * |
| Plaintiff, | * |
| v. | *   Civil Action No. PX 15-3709 |
| CHIRHOCLIN, INC., | * |
| Defendant. | * |

\*\*\*\*\*\*

## MEMORANDUM OPINION

Pending in this breach of contract case is Plaintiff Seymour Fein's motion for summary judgment (ECF No. 32). The issues are fully briefed and the Court now rules pursuant to Local Rule 105.6 because no hearing is necessary. For the reasons stated below, Dr. Fein's motion is granted in part and denied in part.

**I.    BACKGROUND**

Defendant ChiRhoClin, Inc. ("ChiRhoClin" or the "Company") is a pharmaceutical company focused on developing orphan drug products for the gastrointestinal and radiological community. *See* Joint Undisputed Facts, ECF No. 42 at 1–2. The Company was formed in 1997 by the plaintiff, Dr. Seymour Fein, and Dr. Edward Purich. The two doctors launched ChiRhoClin to pursue their goal of developing and commercializing synthetic forms of secretin, a hormone important to pancreatic function, and they were each 50% owners of the Company from 1997 until May 2005. *Id.* at 2. In its early stages, ChiRhoClin was funded by personal loans made by Dr. Purich and Dr. Fein as well as funds received for consulting services carried out by the two doctors. *Id.*

In 1999 ChiRhoClin entered into a licensing agreement with a larger biotechnology company called Repligen. That agreement gave Repligen the exclusive right to market ChiRhoClin's synthetic porcine secretin ("psecretin") products in the event ChiRhoClin's New Drug Application ("NDA") for psecretin was approved by the FDA. *Id.* at 2. ChiRhoClin eventually succeeded in obtaining FDA approval for two forms of synthetic secretin—psecretin and synthetic human secretin ("hsecretin"). The FDA approved ChiRhoClin's NDA for psecretin in 2002 and the NDA for hsecretin in 2004. *Id.* at 3. Because ChiRhoClin had granted an exclusive license to Repligen, only Repligen had the right to sell psecretin while the agreement with Repligen was in place.

ChiRhoClin's relationship with Repligen eventually soured. Repligen commenced arbitration proceedings against ChiRhoClin in 2004, alleging ChiRhoClin had not fulfilled all of its obligations under their licensing agreement. *Id.* at 3–4. Ultimately, the parties reached a settlement as memorialized in their May 9, 2005 Repligen Agreement (the "Repligen Agreement").

The Repligen Agreement provided that ChiRhoClin would pay Repligen $750,000 within five days of the execution of the agreement. It also required ChiRhoClin to deliver a total of 17,000 vials of psecretin to Repligen by September 30, 2007 to cover sales of the product. *Id.* at 4. Repligen agreed to pay ChiRhoClin a royalty payment in the amount of the greater of 15% of net revenues per vial, or $30 per vial, from the sale or transfer of these 17,000 vials. The parties termed this royalty period as the "Initial Period."[1] Repligen Agreement, ECF No. 33-1 at 7

---

[1] Specifically, the Repligen Agreement states:

> This royalty period shall be termed the "<u>Initial Period</u>" and shall run from the first sale or transfer for consideration until the earlier of (i) the sale by Repligen of these 17,000 vials of Product, or (ii) the expiration of these 17,000 vials of Product.

Repligen Agreement, ECF No. 33-1 at 7 (Sealed).

(Sealed). During the Initial Period, the Repligen Agreement provided that "[ChiRhoClin] shall not market, sell, or otherwise transfer to any third party its own pSecretin product." Joint Undisputed Facts, ECF No. 42 at 4–5. Also, during the entire time that ChiRhoClin had any obligation under the Repligen Agreement—both during the Initial Period and thereafter—certain of ChiRhoClin's FDA-authorized documents were required to be placed in escrow for Repligen's use. *Id.* at 5.

Dr. Purich and Dr. Fein agreed that each would contribute $375,000 in the form of loans to ChiRhoClin to secure the $750,000 needed for the settlement. *Id.* In the course of discussing his $375,000 contribution, Dr. Fein explained to Dr. Purich that he wished to cease involvement with ChiRhoClin. Dr. Fein delivered a letter to Dr. Purich on May 4, 2005 (the "May 2005 Agreement" or the "Agreement"), which stated that Dr. Fein would return his portion of ownership to ChiRhoClin for $1.00, loan the company $375,000, and agree to provide consulting services on an as-needed basis. May 2005 Agreement, ECF No. 32-3 at 5. In return, ChiRhoClin agreed that it:

> 4. Will pay to Seymour Fein a 15% royalty on gross revenues from the sale of hsecretin and psecretin. The obligation to pay this royalty will begin when the Company regains the right to sell psecretin. Said royalty to include sales of hsecretin and psecretin licensed to other organizations by the Company including sales in and outside of the United States.
>
> 5. Repay the $375,000 loan in full and with interest, by July 1, 2011. This loan repayment is in addition to the 15% royalty.

*Id*. The May 2005 Agreement was drafted by Dr. Fein and signed by Dr. Purich. After signing the Agreement, Dr. Fein returned his shares of ChiRhoClin stock to the Company, loaned ChiRhoClin the $375,000 it needed for settlement, and began providing consulting services to the Company upon request. Joint Undisputed Facts, ECF No. 42 at 6. ChiRhoClin records show that on May 4, 2009 ChiRhoClin paid $1.00 to Dr. Fein. *Id.* Since the Repligen settlement, Dr.

3

Purich has operated ChiRhoClin as its CEO. Jean Purich, Dr. Purich's wife, is the CFO of ChiRhoClin, and his son, Skip Purich, is the Company's Chief Operating Officer. *Id.* at 1.

In October 2008, the Initial Period of the Repligen Agreement came to an end. ChiRhoClin began to calculate and then make payments to Dr. Fein based upon secretin sales. *Id.* at 7. The only secretin product it was selling, and continues to sell, is ChiRhoStim®, a hsecretin product. It still holds an NDA for psecretin but has chosen not to market or sell a psecretin product.

The first payment made to Dr. Fein was calculated based on 15% of the gross revenue that ChiRhoClin received from sales of ChiRhoStim during the fourth quarter of 2008. ChiRhoClin continued to make payments to Dr. Fein for fifteen subsequent quarters using the same methodology. In 2013, ChiRhoClin stopped making payments to Dr. Fein, citing financial and manufacturing difficulties which forced ChiRhoClin to halt temporarily production of hsecretin. However, Jean Purich continued to calculate the payments owed to Dr. Fein each quarter after January 2013 even though no payments were actually made. *Id.* at 10.

In the spring of 2015, after receiving no payments for more than two years, Dr. Fein asked ChiRhoClin for an update regarding the Company's manufacturing problems. On July 28, 2015, ChiRhoClin resumed full production of its hsecretin product, ChiRhoStim®, having resolved its manufacturing issues. Skip Purich also reassessed the financial health of ChiRhoClin, which included reviewing its agreement with Dr. Fein and exploring the possibility of business expansion in the European Union. *Id.* at 11.

In 2015, ChiRhoClin broached with Dr. Fein that the agreement appeared, improperly in ChiRhoclin's view, to base the royalty calculation on "gross revenue" as opposed to gross *profit*. *Id.* at 11. Dr. Fein refused to alter the basis of royalty payments from gross revenue. On

November 10, 2015, Dr. Purich detailed in writing to Dr. Fein ChiRhoClin's position that the parties had orally agreed to base royalties on gross profit and that the 2005 Agreement did not accurately reflect the true agreement between them. Dr. Purich also noted that ChiRhoChin was not obligated to resume royalty payments because it never regained the right to sell psecretin following the Repligen Agreement. *Id.* at 12; S. Purich Email, ECF No. 32-3 at 12.

On December 3, 2015, Dr. Fein filed the instant action against ChiRhoClin, alleging ChiRhoClin breached the May 2005 Agreement by not paying to him royalties from mid-2012 to August 2015 and repudiating its future obligation to pay Dr. Fein royalties upon regaining the right to see psecretin. ECF No. 1. Dr. Fein also sought to enjoin ChiRhoClin from further violations of the May 2005 Agreement and to compel its specific performance on the Agreement. *Id.* at 11. ChiRhoClin filed its own counterclaims for unjust enrichment and declaratory judgment on January 26, 2016. On June 23, 2016, ChiRhoClin also delivered written notice to Dr. Fein that purports to unilaterally terminate the May 2005 Agreement.

On August 8, 2016, Dr. Fein moved for summary judgment, seeking the Court's determination that ChiRhoClin breached the May 2005 Agreement. Dr. Fein further sought declaratory and injunctive relief to ensure that ChiRhoClin continues to pay him royalties in the future. Dr. Fein also urged the Court to summarily deny ChiRhoClin's counterclaims for unjust enrichment and declaratory judgment.

## II. STANDARD OF REVIEW

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). However, summary judgment is inappropriate if any material fact at issue "may

reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). At the same time, the court must construe the facts presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

### III. ANALYSIS

#### A. Contract Interpretation Under Maryland Law

Maryland law regarding contract formation and interpretation is well-settled. "[T]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 73 (2013) (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14 (2006)). Nonetheless,

> [c]ourts in Maryland apply the law of objective contract interpretation, which provides that "[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding."

*Id.* (quoting *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368 (1958)). Thus, a contract "is 'measured by its terms unless a statute, regulation, or public policy is violated thereby.'"

*Connors v. Gov't Employees Ins. Co.*, 216 Md. App. 418, 426 (Md. Ct. Spec. App. 2014) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383 (1985)).

When construing an unambiguous contract, "courts focus on the four corners of the agreement[,] and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 469 (Md. Ct. Spec. App. 2012) (citations and quotation marks omitted); *see 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 234 (2013). "As such, '[a] contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution.'" *Dumbarton*, 434 Md. at 51–52 (quoting *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 167 (2003)). In these circumstances, the contract's construction is "an issue of law for resolution by the trial judge." *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 82 Md. App. 9, 26 (Md. Ct. Spec. App. 1990); *Pacific Indem. Co.*, 302 Md. at 389.

By contrast, "when a writing is ambiguous, extrinsic evidence is admissible to determine the intentions of the parties to the document." *Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 213 Md. App. 222, 254 (Md. Ct. Spec. App. 2013); *see Sy–Lene*, 376 Md. at 163 (stating that parol evidence showing the meaning of contract language "is only admissible after the court finds the contract to be ambiguous"). Contract language is ambiguous "if, to a reasonably prudent person, the language used is susceptible of more than one meaning." *Bd. of Educ. of Charles Cnty.*, 82 Md. App. at 27. "An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." *Dumbarton*, 434 Md. at 54 (quoting *Belleview Const. Co. v. Rugby Hall Cmty. Ass'n, Inc.*, 321 Md. 152, 159 (1990)). But any "extrinsic evidence admitted must help interpret the ambiguous

language and not be used to contradict other, unambiguous language." *Calomiris v. Woods*, 353 Md. 425, 441 (1999).

Further, "'[i]t is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument.'" *John L. Mattingly Const. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327 (2010) (quoting *Burroughs Corp. v. Chesapeake Petroleum & Supply Co.*, 282 Md. 406, 411 (1978)). However, this interpretive presumption has no application where the record contains extrinsic evidence sufficient to discover the intention of the parties to the contract. *See Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 405 (1985); *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 198 (1981). *See also Rossi v. Douglas*, 203 Md. 190, 198 (1953) (stating that "[t]he rule that doubtful language is to be interpreted against the party who drafted the instrument is only a secondary rule of construction."). Where the contract terms at issue are ambiguous, summary judgment is only appropriate when the "ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007)).

At the heart of the parties' dispute is interpreting the following clause of the May 2005 Agreement:

> ChiRhoClin . . . [w]ill pay to Seymour Fein a 15% royalty on gross revenues from the sale of hsecretin and psecretin. **The obligation to pay this royalty will begin when the Company regains the right to sell psecretin**. Said royalty to include sales of hsecretin and psecretin licensed to other organizations by the Company including sales in and outside of the United States.

May 2005 Agreement, ECF No. 32-3 at 5 (emphasis added). ChiRhoClin advances two principal arguments for why it need not pay royalties to Dr. Fein. First, it argues that ChiRhoClin never "regained the right to sell psecretin" following the Repligen Settlement. Thus, the condition

precedent to its obligation to pay Dr. Fein royalties has never been satisfied. Second, it argues that it entered into the 2005 Agreement by mistake and so the Agreement is subject to reformation or rescission. ChiRhoClin's understanding at the time it executed the Agreement was that the royalties payable to Dr. Fein would be calculated based on gross *profit*, not gross *revenue* as the Agreement states.

**B.     Whether ChiRhoClin Ever "Regained the Right to Sell psecretin"**

At issue is the meaning of regaining the "right to sell psecretin." The Agreement leaves this phrase "right to sell" undefined. Dr. Fein argues that the phrase refers to the end of the Initial Period provided in the Repligen Agreement. Pl.'s Mot. Summ. J., ECF No. 32-1 at 15. Under the Repligen Agreement, ChiRhoClin was prohibited from marketing or selling its psecretin product during the Initial Period. So when the Initial Period ended, ChiRhoClin "regained the right to sell psecretin." Thus, Dr. Fein argues that ChiRhoClin was obligated to begin paying royalties at the end of the Initial Period in October 2008.

According to ChiRhoClin, regaining "the right to sell psecretin" must be read to mean the day it actually acquires the ability to commercially sell a psecretin product. Def.'s Response to Pl.'s Mot. Summ. J., ECF No. 37 at 25. The end of the Initial Period, argues ChiRhoClin, only signals an *opportunity* to begin producing and selling a psecretin product; but until it obtains FDA approval process to bring a psecretin drug to market, ChiRhoClin does not have the "right to sell a psecretin product."

Here, the phrase "right to sell psecretin" is ambiguous because it is susceptible to more than one reasonable interpretation. On the face of the Agreement between Dr. Fein and ChiRhoClin, "right to sell" can either mean right under the law (as determined by the FDA) or right as circumscribed by private parties pursuant to another settlement agreement (as determined

by the Repligen Agreement). Nothing in the May 2005 Agreement itself clarifies this ambiguity, and to the Court must determine whether extrinsic evidence can so clearly resolve the ambiguity that summary judgment is warranted. *See Washington Metro. Area Transit Auth.*, 476 F.3d at 235.

Dr. Fein argues that ChiRhoClin's history of paying royalties once the Initial Period had terminated, and without having obtained FDA approval to sell a psecretin drug, demonstrates that ChiRhoClin understood that it had regained "the right to sell psecretin" at the end of the Initial Period. Pl.'s Mot. Summ. J., ECF No. 32-1 at 19. *See* Sealed Ex. 15 (Jan. 28, 2009 email from J. Purich showing first payment to Dr. Fein); Sealed Ex. 14 at 2; Sealed Ex. 16 (April 15, 2010 email from Dr. Fein discussing the commencement of payments when ChiRhoClin regained the right to sell psecretin from Repligen "around October 1, 2008"); Sealed Ex. 1 (April 11, 2011 letter signed by Dr. Purich confirming that payments to Dr. Fein began in October 2008 and will continue indefinitely); Sealed Ex. 101, Jean Purich Deposition at 51:13-52:19, ECF No. 33-2 at 14 (confirming payments to Dr. Fein began in October 2008). These royalty payments were calculated as 15% of gross revenue from the sale of ChiRhoClin's secretin products, less the cost of shipping, in accord with the parties' May 2005 Agreement. ChiRhoClin continued making quarterly payments to Dr. Fein every quarter for nearly four years. And even when Dr. Fein stopped receiving royalty payments in 2012 as a result of ChiRhoClin's financial and manufacturing issues, ChiRhoClin continued to calculate and keep track of the unpaid royalties.

ChiRhoClin counters that the payments at issue were not "royalty payments" but rather were repayments of Dr. Fein's $927,750 outstanding loans to the Company. *See* Sealed Ex. 102, E. Purich Deposition, 105:17–106:22, ECF No. 33-3 at 28; Sealed Ex. 101, J. Purich Deposition, 47:18–48:11, ECF No. 33-2 at 13. According to ChiRhoClin, these loan payments began at Dr.

Fein's request and as ChiRhoClin financial health improved. Indeed, Dr. Fein himself admitted that some of the supposed royalty payments were treated as loan repayments for tax purposes. *See* Sealed Exhibit 104, S. Fein Deposition, 110–115:21; Def.'s Undisputed Facts, ECF No. 37-14 at 7. Consequently, that ChiRhoClin began making some sort of payment to Dr. Fein in October 2008, ChiRhoClin maintains, does not conclusively establish that the May 2005 Agreement unambiguously required royalty payments at the end of the Initial Period.

If "resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact." *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)). Here, the parties point to differing portions of the factual record to support their interpretation of the contract. Although most of the extrinsic evidence appears to favor Dr. Fein's interpretation, ChiRhoClin points to plausible counter-facts which demonstrate the post Initial Period payments were loan reimbursements and not royalties. Resolution of this dispute would require fact-finding and credibility determinations which are prohibited at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, Dr. Fein's motion for summary judgment is denied as to its breach of contract claim.

**C.     Whether the Parties Entered into the March 2005 Agreement as a Result of Mistake**

ChiRhoClin argues that even if the condition precedent of regaining the right to sell psecretin has been met, the May 2005 Agreement should not be enforced because it was entered into on the basis of a mutual or unilateral mistake. ChiRhoClin maintains that when Dr. Purich and Dr. Fein began discussing an agreement between the Company and Dr. Fein, the parties

orally agreed that royalty payments would be based on 15% of ChiRhoClin's profits, not gross revenue. Def.'s Response to Pl.'s Mot. Summ. J., ECF No. 37 at 30. Dr. Purich claims that he should have noticed this mistake when proofreading the Agreement but simply overlooked it. Sealed Ex. 102, E. Purich Deposition 203:7–21, ECF No. 33-3 at 52.

The law is clear that absent mutual mistake or intentional, culpable conduct resulting in a unilateral mistake, "one having the capacity to understand a written document who reads and signs it, or, without reading it or having it read to him, signs it, is bound by his signature in law, at least." *Creamer v. Helferstay*, 294 Md. 107, 123 (1982) (quoting *Ray v. William G. Eurice & Bros.*, 201 Md. 115, 125 (1952)). Here, the alleged mistake is certainly not mutual and ChiRhoClin does not argue that it entered into the Agreement because of fraud, duress, or undue influence. Moreover, neither reformation or rescission are available where, as here, a party simply neglected to read carefully the contract before he signed it. *Cf. Julian v. Buonassissi*, 414 Md. 641, 667 n.15 (2010) ("Our jurisprudence is clear that when a competent person signs a contract ... in the absence of fraud, misrepresentation, mistake, undue influence, or fiduciary relations, the contract will be enforced."). Accordingly, the Court finds that ChiRhoClin's defense based on mutual and unilateral mistake fail as a matter of law.

### D.     ChiRhoClin's Attempted Termination of the Letter Agreement

On June 23, 2016, ChiRhoClin delivered a letter to Dr. Fein unilaterally terminating the May 2005 Agreement. Thus, to the extent that the May 2005 Agreement is ultimately determined to entitle Dr. Fein to any payments from ChiRhoClin, ChiRhoClin argues that any such obligations must cease as of this termination date. Def.'s Response to Pl.'s Mot. Summ. J., ECF No. 37 at 20. Dr. Fein argues that when the parties signed the Agreement they understood that Dr. Fein would receive royalties from sales of secretin products for as long as sales took place.

He argues that nothing prevents the parties from agreeing to this commitment and ChiRhoClin has cannot unilaterally terminate the contract on this ground. *See* Pl.'s Reply to Mot. for Summ. J., ECF No. 41 at 10–12.

As ChiRhoClin correctly observes, a contract may not exist in perpetuity in the absence of an express provision, and in such absence, "a reasonable duration will be implied by the court." *Lerner v. Lerner Corp.*, 132 Md. App. 32, 45 (2000). Further, "[w]hen the contract calls for successive performances but is indefinite in duration, it is commonly terminable by either party, with or without a requirement of reasonable notice." Restatement (Second) of Contracts § 33 cmt. d (1981). Yet, even absent any explicit length of time, the contract's duration may be defined by contingent future events. *See Pumphrey v. Pelton*, 250 Md. 662, 665 (Md. 1968) ("The fact that Clause 19 provides that it terminates upon the expiration of the patents and copyrights saves it from the rule that a contract may not exist in perpetuity in the absence of an express provision.").

Maryland courts have made clear that a contract is not indefinite where an obligor's performance is conditioned on conduct that is within a party's control. *See, e.g.*, *Boland v. Boland*, 423 Md. 296, 369 (2011); *Pumphrey*, 250 Md. at 665. In the context of royalty payments, *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, is instructive.[2] *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc*, 178 F. Supp. 655 (S.D.N.Y. 1959), *aff'd*, 280 F.2d 197 (2d Cir. 1960). There, the manufacturer of Listerine was bound by a written contract to pay Listerine's developer and "his heirs executors & assigns" a fee of "six

---

[2] Some courts in other jurisdictions have adopted *Warner-Lambert Pharmaceutical Co.*'s reasoning. *See, e.g.*, *Lamoureux v. MPSC, Inc.*, No. CV 14-1488 (JRT/BRT), 2015 WL 8082598, at *5 (D. Minn. Dec. 7, 2015); *Stetson v. Pfaltzgraff Co.*, No. 90 CIV. 6727(LMM), 1991 WL 275648, at *3 (S.D.N.Y. Dec. 18, 1991); *Consol. Theatres, Inc. v. Theatrical Stage Emp. Union*, *Local 16*, 69 Cal. 2d 713, 725–27 (1968).

dollars on each & every gross of Listerine" manufactured or sold. *Id.* at 660. The contract contained no end date. *Id.* Seventy-five years later, the manufacturer wanted out of its payment obligation and made the argument that ChiRhoClin makes now, "invok[ing] the shade, if not the substance, of the traditional common law distaste for contractual rights and duties unbounded by definite limitations of time." *Id.* at 662. The *Listerine* court was not persuaded. First, it held that the contract remained in effect despite its lack of end date because the plain language of its provisions contemplated all of the contractual rights would pass to the developer's "heirs executors & assigns." *Id.* The court also noted the law's general distaste for "perpetual" contracts did not apply in this case because the royalty contract was not perpetual or indefinite. The manufacturer's obligation was conditional—on the continued manufacture of Listerine—and therefore the company could always "terminate its obligation to pay whenever in good faith it desires to cease the manufacture or sale of Listerine." *Id.* at 662–63.

Here, the May 2005 Agreement states that ChiRhoClin "[w]ill pay to Seymour Fein a 15% royalty on gross revenues from the sale of hsecretin and psecretin." ChiRhoClin's obligation to pay royalties, therefore, ceases when it stops selling hsecretin and psecretin, an event completely within ChiRhoClin's control. Accordingly, applying the rationale of *Listerine*, the contract is not one that lasts in perpetuity. ChiRhoClin, therefore cannot unilaterally terminate the contract and must instead pay such royalties once the necessary condition precedents are satisfied.

### E.     ChiRhoClin's Counterclaims

ChiRhoClin's brings counterclaims against Dr. Fein for unjust enrichment and declaratory judgment.  Specifically ChiRhoClin alleges that Dr. Fein "wrongfully accepted and retained $1,915,002" in loan repayments and royalties ChiRhoClin was never contractually

obligated to pay because, under the May 2005 Agreement, ChiRhoClin had not yet regained the right to sell psecretin. Counterclaims, ECF No. 10 at 18. Alternatively, ChiRhoClin claims that even if it had regained the right to sell psecretin thus triggering the resumption of royalties under the May 2005 Agreement, Dr. Fein was unjustly enriched by the overpayment based on calculating royalties off of revenues and not profits. Finally, in its declaratory judgment count, ChiRhoClin asks that the Court find that:

> (1) . . . Plaintiff breached the common law fiduciary duties of loyalty, good faith and fair dealing that he owed to the Company; (ii) the Company did not regain and does not have the right to sell psecretin; (iii) that the Company had no obligation to repay Plaintiff's $375,000 loan under the terms of the May 2005 Agreement; and (iv) the Company never had an obligation to make royalty payments to Plaintiff, irrespective of how such payments were measured.

Counterclaims, ECF No. 10 at 20.

Dr. Fein asks this Court to "summarily deny ChiRhoClin's counterclaims for . . . unjust enrichment." Pl.'s Mot. for Summ. J., ECF No. 32-1 at 23. He notes that "Maryland law does not permit a claim for unjust enrichment where an express contract governs." *1899 Holdings, LLC v. 1899 Liab. Co.*, 568 F. App'x 219, 227 (4th Cir. 2014) (quoting *Cnty. Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83 (2000)). The May 2005 Agreement is a written contract and, "for that reason alone ChiRhoClin's . . . counterclaims must fail." Pl.'s Mot. for Summ. J., ECF No. 32-1 at 24.

"Generally, courts are hesitant to deviate from this principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter." *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 100 (2000) (footnotes omitted). This rule "holds the contract parties to their agreement and prevents a party who made a bad business decision from asking

the court to restore his expectations." *1899 Holdings*, *LLC*, 568 F. App'x at 227 (internal citations and quotation marks omitted).

Here, ChiRhoClin argues that the payments undergirding the unjust enrichment counterclaims were "ill gotten [sic] gains paid in error" rather than payments related to the May 2005 Agreement. ECF No. 37 at 33. But the Defendant framed its unjust enrichment claims as arising from the May 2005 Agreement. Counterclaims, ECF No. 10 at ¶ 65 ("Plaintiff knew that CRC was not obligated to repay Plaintiff's $375,000 loan or to make any royalty payments until CRC regained the right to sell psecretin."); *Id.* at ¶ 71 ("In the event that the condition precedent to Plaintiff receiving royalties and repayment of his $375,000 loan was triggered, the amount of royalties to which Plaintiff would have been entitled is far less than the $1,540,002 that Plaintiff has already received in *royalties* from CRC as the royalty payments have been miscalculated."). Indeed, ChiRhoClin in its answer to Plaintiff's Complaint even admitted that "Plaintiff owned 50%" of the company "until May 2005 when he sold his ownership stake in exchange for, among other things, being released from past, present and future financial and legal obligations of the Company, as reflected in Exhibit A to the Complaint (a copy of a **May 4, 2005 Agreement entered between CRC and Plaintiff**)." Answer, ECF No. 10 at 1 (emphasis added).

ChiRhoClin now argues in its opposition to summary judgment that the entirety of payments to Dr. Fein arose outside the May 2005 Agreement because they are repayments on loans totaling $927,750. This argument is unavailing for several reasons. First and foremost, the Court must consider the counterclaims as pleaded, and as pleaded, they concern the same subject matter as that covered in the May 2005 Agreement. Thus, ChiRhoClin's counterclaims fail as a matter of law. *See Cnty. Com'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 98 n.8 (collecting cases).

ChiRhoClin's factual about-face also undermines the legal viability of claiming Dr. Fein was unjustly enriched as pleaded. ChiRhoClin now argues that construing the facts most in its favor reveals that its payments to Dr. Fein are loan repayments and not royalty payments. *See* Def.'s Response to Pl.'s Mot. for Summ. J., ECF No. 37 at 14 ("ChiRhoCin agreed to begin to repay loans owed to Dr. Fein . . . a total of $927,750 during the course of his relationship with ChiRhoClin); *Id.* at 27 ("they payments made to Dr. Fein beginning in 2008 were to repay the $927,000 loans Dr. Fein made to the company."). This means then that Dr. Fein is indeed *entitled* to those payments as loan reimbursements, and as such, is not *unjustly* enriched. Further, to the extent the Defendant now claims Dr. Fein was overpaid *vis* outstanding loans that he made to ChiRhoClin, then the Defendant must base its unjust enrichment counterclaims on alleged *loan* overpayments. This Defendant did not do. Thus, ChiRhoClin's counterclaims as pleaded cannot survive.

What remains is ChiRhoClin's counterclaim for declaratory judgment. Aside from requesting that ChiRhoClin's claim for declaratory judgment be "summarily denied," Dr. Fein puts forward no legal basis supporting dismissal. He therefore has failed to meet his burden of showing that he is entitled to summary judgment on this claim. *See DSM Nutritional Prod., LLC*, No. WDQ-11-0446, 2014 WL 1003844, at *4 (D. Md. Mar. 13, 2014).

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff Seymour Fein's motion for summary judgment is granted in part and denied in part. It is granted with respect to ChiRhoClin's counterclaims for unjust enrichment, but is denied with respect to Dr. Fein's claims for breach of contract and injunctive relief and ChiRhoClin's claim for declaratory judgment. A separate order will follow.

| | |
|---|---|
| 2/3/2017 | /S/ |
| Date | Paula Xinis |
| | United States District Judge |